776 So.2d 1066 (2001)
STATE of Florida, Appellant,
v.
Derrick WILLIAMS, Appellee.
No. 4D99-2677.
District Court of Appeal of Florida, Fourth District.
February 7, 2001.
Robert A. Butterworth, Attorney General, Tallahassee, and Douglas J. Glaid, Assistant Attorney General, Fort Lauderdale, for appellant.
Carey Haughwout, Public Defender, and Margaret Good-Earnest, Assistant Public Defender, West Palm Beach, for appellee.
GROSS, J.
The state timely appeals an order granting Derrick Williams's renewed motion for *1067 judgment of acquittal.[1] We affirm, holding that because the unlawful use of the automobile in this case was not a distinct offense separate from the carjacking that occurred the night before, appellant's flight from the police in the stolen car twenty-four hours after the carjacking did not bring this case within the ambit of the felony murder statute.
At about 1:00 a.m. on February 3, 1997, Lisa Rouse was the victim of a carjacking. She drove to a Farm Store with two friends. She was sitting behind the wheel of her Jeep Cherokee when appellee Williams approached her and asked if he could get a light. Rouse then felt a hand "tearing [her] collar." Someone grabbed her and pulled her out of the car. Later, Rouse identified the three carjackers, including Williams, from photo line-ups.
Close to 1:00 a.m. on February 4, 1997, Officers Tammy Clyde and Steve Sparkman of the Hollywood Police Department observed a "black Jeep Cherokee with its lights off, facing the wrong way on the road." They approached the vehicle and obtained the tag number. After Officer Clyde called the tag in, she learned that the vehicle was stolen. When the officers got behind the Jeep, the driver "hit the gas" and "took off."
The Jeep turned left, heading west, and ran a stop sign. The officers turned on their emergency lights and siren and pursued the vehicle. The Jeep then ran a second stop sign, never slowing down or braking. Its headlights were still off.
The Jeep turned onto 21st Avenue. The police followed; at one point during the chase, the cars' speed reached about seventy-five miles per hour. Never slowing down, the Jeep passed a flashing yellow light. At the intersection of Sheridan Street and 21st Avenue, the Jeep ran a red light and crashed into the driver's side of a van. Officer Clyde described the impact as a "big explosion." When the officers arrived at the scene, they observed "two black males" running from the empty Jeep. Veronica Dunn, a passenger in the van, died from "[m]ultiple blunt force trauma to the head and chest," as a result of the accident.
The dog of a K-9 officer located Williams hiding underneath a car in a parking lot near the accident scene. Williams was transported to the hospital for treatment of injuries to his wrist resulting from a dog bite.
Detective Mark Smith took a statement from Williams at the hospital. Williams said that he was in the right front passenger seat during the chase. The chase occurred after they had turned the wrong way down a one-way street. A police car pulled up behind them. The chase began after a co-defendant told the driver, "[S]how-um what you can do." Williams admitted that the Jeep had been taken in a carjacking and that he had driven the car at some point. He told the detective that he and his friends "had been browsing around" in the car. They had eaten at Papa John's Pizza and "hung out" by a church near a 7-Eleven, nine blocks away from the accident scene. At one point while they were in possession of the Jeep, they had been approached by a police officer behind a Miami Subs in Hollywood.
The state charged Williams with carjacking and third degree murder. The carjacking was charged as a first degree felony under section 812.133(2)(b), Florida Statutes (2000).[2] The state did not use the *1068 carjacking as the underlying felony for the felony murder; such a charge would have been a capital felony under section 782.04(1)(a)2.l., Florida Statutes (2000). Instead, the state based the third degree felony murder charge upon the grand theft of the Jeep on February 4, 1997.[3]
The carjacking count was severed and Williams entered a plea of guilty to it.
At the conclusion of the state's case in the jury trial on the felony murder charge, Williams moved for judgment of acquittal. He argued that there had been a break in the chain of circumstances and that Dunn was not killed while Williams was "engaged in the commission of" grand theft auto.
The state agreed that the offense of carjacking had been completed prior to the victim's death, which was why the state had not charged Williams with first degree felony murder. The prosecutor argued that the underlying crime for the felony murder was grand theft auto and that grand theft was an offense continuing at the time of the flight from the police and the fatal crash. The trial court denied the defense motion for judgment of acquittal.
The jury found Williams guilty of third degree murder. Before sentencing, Williams filed a renewed motion for judgment of acquittal, which the trial court granted on the authority of Lester v. State, 737 So.2d 1149 (Fla. 2d DCA 1999).
To review the defendant's motion, the trial court was required to view the facts in the light most favorable to the state to see if they established a prima facie case of guilt. See, e.g., Thomas v. State, 743 So.2d 1190, 1192 (Fla. 4th DCA 1999).
Third degree murder is defined as "[t]he unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate" any felony other than those enumerated in the statute. § 782.04(4), Fla. Stat. (2000). The felony supporting the conviction is grand theft auto, not an enumerated felony. As contained in the information, the grand theft was described as
unlawfully and knowingly using or endeavoring to use the property of [the victim], to-wit: a Jeep motor vehicle, with the intent to temporarily or permanently deprive [the victim] of a right to the property or benefit therefrom, or to appropriate the property to [defendants'] own use or the use of any person not entitled to the use of the property, knowing or having reason to know said property was stolen.
See § 812.014(2)(c)6., Fla. Stat. (2000).
The crux of this case is the breadth of the phrase "engaged in the perpetration of... any felony" in the felony murder statute. The three gradations of felony murder in section 782.04 all make use of the same language in defining the crime. See § 782.04(1)(a)(2), (3), (4), Fla. Stat. (2000).
Construing the felony murder statute, Jefferson v. State, 128 So.2d 132, 136 (Fla. *1069 1961), focused on whether the killing was "part of the same transaction as the felony." The supreme court quoted the res gestae rule from a learned treatise:
Whether the felony was technically completed, is not of itself sufficient to take the case out of the category of felony murders. It is a homicide committed during the perpetration of a felony, if the homicide is part of the res gestae of the felony.
Id. at 137 (quoting 1 WARREN, HOMICIDE. 332). The supreme court later cited this rule with approval in Campbell v. State, 227 So.2d 873, 878 (Fla.1969).
Translated from Latin to English, "res gestae" means "things done." BLACK'S LAW DICTIONARY 1173 (5th ed.1979). Although some cases have sought to define "res gestae,"[4] the term has more recently fallen into disuse because of its tendency to obscure analysis. One commentator has recognized that there was no way that the scope of the res gestae rule could be defined with precision:
Although the vagaries in the use of the term "res gestae" have been frequently criticized, as in United States v. Matot,[5] [146 F.2d 197 (2d Cir.1944)], there seems to be little indication that its meaning will be clarified in the future, no doubt because of the academic character of the problem, and also because of the weight and influence of prior decisions.
2 CHARLES E. TORCIA, WHARTON'S CRIMINAL EVIDENCE § 288, at 234 n. 38 (14th ed.) (1986) (footnote supplied).
In deciding whether a killing falls under the felony murder statute, the more recent supreme court case of Parker v. State, 641 So.2d 369, 376 (Fla.1994), looked for a "break in the chain of circumstances" between the killing and the underlying felony. See also McFarlane v. State, 593 So.2d 305, 306 (Fla. 3d DCA 1992) (holding that no "break in the chain of events" occurred to relieve the defendant of "criminal responsibility for the deal of his accomplice"). To determine whether such a break had occurred, the supreme court considered that the purpose of the felony murder statute
is to protect the public from inherently dangerous situations caused by the commission of the felony. State v. Hacker, 510 So.2d 304, 306 (Fla. 4th DCA 1986). Therefore, "[i]n the absence of some definitive break in the chain of circumstances beginning with the felony and ending with the killing, the felony, although technically complete, is said to continue to the time of the killing." Mills v. State, 407 So.2d 218, 221 (Fla. 3rd DCA 1981).
Parker v. State, 641 So.2d at 376 (quoting Parker v. State, 570 So.2d 1048, 1051 (Fla. 1st DCA 1990)).
Some cases indicate that the felony murder statute accomplishes its purpose of protecting the public by deterring the commission of felonies.[6] However, emphasizing *1070 the deterrent effect of the statute gives those who perpetrate felonies too much credit for reflective thought. Another, more realistic, view is to focus on the punitive aspect of the statute and conclude that the felony murder law is primarily result-oriented in its enhancement of punishment for dangerous conduct connected with a felony that causes the death of another.
To find what the supreme court calls "a break in the chain of circumstances" between the killing and the underlying felony, courts focus on the time, distance, and causal relationship between the underlying felony and the killing. See Parker, 570 So.2d at 1051. "Neither the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction when it can be said ... that the killing is a predictable result of the felonious transaction." Mills, 407 So.2d at 221.
Flight from the police in a car at a high rate of speed is an "inherently dangerous situation," of which a fatal automobile accident is a "predictable result." See Hacker, 510 So.2d at 306. In evaluating flight, one of the most important factors to consider in deciding if there has been a "break in the chain of circumstances" is whether the "fleeing felon has reached a place of temporary safety." Parker, 570 So.2d at 1051 (quoting LAFAVE, SUBSTANTIVE CRIMINAL LAW, § 7.5 (1986)). If the felon has gained a place of temporary safety after commission of the felony and before the death of the victim, the felony murder rule generally does not apply. See State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000).
At issue in this case is whether the felony murder "chain of circumstances" is measured from the carjacking which occurred on February 3. Parker indicates that the "chain of circumstances" is measured from the underlying felony. 641 So.2d at 376. The state argues that the underlying felony in this case was the grand theft, the unauthorized use of the car on February 4. We conclude that the grand theft in this case cannot be separated from the carjacking for the purpose of applying the felony murder statute.
In deciding whether a killing was "perpetrated by a person engaged in the perpetration of ... any felony" within the meaning of section 782.04(4), a court must apply the rule of lenity codified at section 775.021(1), Florida Statutes (2000), which provides:
The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.
Application of this rule means that if the language of the felony murder statute is susceptible to a reasonable construction that is favorable to the accused, a court must employ that construction.
Grand theft of an automobile is a necessarily lesser included offense of the carjacking of the same vehicle. See Fryer v. State, 732 So.2d 30, 33 (Fla. 5th DCA 1999). There is no temporal limit on the conduct element of the grand theft statute; one commits grand theft if one "obtains or uses" property with the requisite criminal intent. The statute casts the unit of prosecution in terms of the property stolen, and not on how long the property is possessed by the thief. Thus, where a defendant steals a car and uses it for six months, double jeopardy principles limit *1071 the state to one grand theft charge, and not multiple charges each time the defendant enters the car and begins to drive it. Compare Brown v. Ohio, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (stating that a nine day joyride could not be the basis for multiple convictions where the applicable criminal statute did not make each day of continued use a separate criminal offense).
Although the legislature has the power to allow for separate crimes from one criminal episode, no such legislative intent is apparent in the aspect of the grand theft statute at issue in this case. Compare Grappin v. State, 450 So.2d 480 (Fla.1984) (holding that use of the article "a" in conjunction with theft of firearms under section 812.014(2)(c)5 indicated legislative intent to allow multiple punishments for stealing a number of firearms from one person at the same time).
Williams's "grand theft" of the car on February 4 was a lesser included offense of the carjacking he committed on February 3. The unlawful use on February 4 did not amount to a crime separate from the carjacking. The "chain of circumstances" on the felony murder charge is therefore measured from the February 3 carjacking.
As the state acknowledged at trial, there had been a break in the chain of circumstances during the twenty-four hours from the carjacking until the death of the victim. Williams and his cohorts had reached several places of temporary safety after fleeing from the scene of the carjacking; they stopped for pizza and hung out near a 7-Eleven and a Miami Subs shop. Obviously, they were not in continuous flight from the police from the moment after the carjacking until the fatal collision. Because of these breaks in the chain of circumstances, Williams was not "engaged in the perpetration" of the carjacking at the time of the fatal accident.
As the trial court recognized, Lester v. State, 737 So.2d 1149 (Fla. 2d DCA 1999) is similar to this case. There, at about 10:00 a.m., defendant Cedric Lester was driving a car which had been reported stolen the previous evening. The defendant spotted a police car and took off through a red light to avoid being stopped. Lester ran three stop signs and was traveling at about sixty miles per hour when he collided with another car, causing injuries to a passenger who later died. See Lester, 737 So.2d at 1150-51. The second district reversed a third degree felony murder conviction, holding that the defendant's "reckless driving was too attenuated from the grand theft of the car the previous evening to support a felony murder conviction." Id. at 1151 (italics supplied); see Allen v. State, 690 So.2d 1332 (Fla. 2d DCA 1997).
Lester presents a weaker case for finding a break in the chain of circumstances between the death and the underlying felony than does this case. The evidence at trial was that Lester did not steal or drive the car when it was taken the previous evening. Lester told a police officer that he knew the car was stolen. The implication in the case is that Lester's unlawful use of the car first took place on the same morning as the accident. Nonetheless, the second district looked to the grand theft of the car the previous night to determine whether Lester's reckless driving was "too attenuated" from the grand theft to support a felony murder conviction. Lester, 737 So.2d at 1151.
Lester fails to take into account that the defendant's use of the car the day after the initial taking was a violation of the grand theft statute apart from any crime committed the day before by another. Under Lester's facts, it makes no sense to begin the felony murder "chain of circumstances" with the original theft committed by another, instead of from the defendant's felonious conduct immediately preceding and during the fatal accident.
Unlike Lester, the defendant in this case participated in the carjacking the night before the victim's death, so the felony murder charge is properly measured from *1072 the time of the original felony that subsumes the defendant's later unlawful use into the same criminal conviction.
Recently, the supreme courts of Tennessee and Virginia have considered fact situations similar to the one in this case. See State v. Pierce, 23 S.W.3d 289 (Tenn.2000); Commonwealth v. Montague, 536 S.E.2d 910 (Va.2000). Both courts have agreed with the result in Lester.
Pierce involved a defendant who was a principal in the theft of a van. Twenty days after the initial taking, the defendant was driving the van and attempting to flee from the police when he collided with a patrol car and killed a deputy. The state charged the defendant with felony murder based on the theft of the van. See 23 S.W.3d at 291-93.
The state argued in Pierce that the defendant was committing theft by exercising control over the van and that the killing was causally connected to the theft because the defendant was "attempting to evade arrest for the theft when the fatal collision occurred." 23 S.W.3d at 295. The state in Pierce made the same continuing crime argument that the state makes in this case:
The State's position is that no period of time or intervening events can break the chain between the felony and the killing when the underlying felony is theft. According to the State, so long as a defendant is exercising control over an article of stolen property when an accidental or unintentional killing occurs, that defendant can be convicted of felony murder even it the property was initially stolen twenty years before the accidental or unintentional killing.
Id. at 295.
The Supreme Court of Tennessee rejected this argument, holding that for the felony murder statute to apply when the underlying felony is theft, "a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action." 23 S.W.3d at 295 (quoting Lester, 737 So.2d 1151) (emphasis supplied).
We agree with the reasoning given in Pierce to support the holding:
If the [felony murder] rule is to have any deterrent effect, it must not be extended to killings which are collateral to and separate from the underlying felony. Moreover, requiring a close nexus between the initial taking and the killing is particularly appropriate given that the felony murder rule is "a legal fiction in which the intent and the malice to commit the underlying felony is `transferred' to elevate an unintentional killing to ... murder."
Pierce, 23 S.W.3d at 296 (quoting State v. Buggs, 995 S.W.2d 102, 107 (Tenn.1999)).
We note that our application of the felony murder rule is consistent with the application of the statute of limitations to the crime of grand theft. If, as the state contends, grand theft is an offense that continues throughout a defendant's unauthorized use, it would follow that a prosecution could commence ten years after the initial unlawful taking, so long as the defendant were caught using the property ten years later. However, we have held that grand theft is not a continuing offense for the purpose of the statute of limitations. See O'Malley v. Mounts, 590 So.2d 437, 438 (Fla. 4th DCA 1991). O'Malley held that the statute of limitations in a grand theft is measured from the time of the felonious taking, not a later point in time where the victim legally suffered a loss. Acceptance of the continuing crime argument in this case would create an anomalya defendant could be charged with third degree felony murder even where the statute of limitations would preclude prosecution for the underlying felony of grand theft.
Our holding in this case relates only to the operation of grand theft in the context of the felony murder rule. It does not narrow the definition of theft for the purpose *1073 of prosecution of that offense, nor does it change the analysis courts should apply when viewing theft for other purposes, such as venue or jurisdiction.
AFFIRMED.
KLEIN and TAYLOR, JJ., concur.
NOTES
[1] This court has jurisdiction. See Fla. R.App.P. 9.140(c)(1)(E).
[2] Section 812.133, Florida Statutes (2000) provides:

(1) "Carjacking" means the taking of a motor vehicle which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the motor vehicle, when in the course of the taking there is the use of force, violence, assault, or putting in fear.
(2)(a) If in the course of committing the carjacking the offender carried a firearm or other deadly weapon, then the carjacking is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.
(b) If in the course of committing the carjacking the offender carried no firearm, deadly weapon, or other weapon, then the carjacking is a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, ors. 775.084.
(3)(a) An act shall be deemed "in the course of committing the carjacking" if it occurs in an attempt to commit carjacking or in flight after the attempt or commission. (b) An act shall be deemed "in the course of the taking" if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events.
[3] Under the facts of this case, the state might have charged Williams with vehicular homicide, section 782.071(1), Florida Statutes (2000), or fleeing or attempting to elude a law enforcement officer, section 316.1935(3), Florida Statutes (2000), both second degree felonies carrying the same punishment as third degree felony murder. See § 782.04(4), Fla. Stat. (2000).
[4] For example, in State v. Fouquette, 221 P.2d 404, 416-17 (Nev.1950), the court discussed the concept of res gestae in the context of a felony murder statute:

The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with it, as well as acts immediately following it and so closely connected with it as to form in reality a part of the occurrence.
(Citations omitted).
[5] In United States v. Matot, 146 F.2d 197, 198 (2d Cir.1944), Judge Learned Hand characterized "res gestae" as "a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology; if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms."
[6] For example, in State v. Hacker, 510 So.2d 304, 306 (Fla. 4th DCA 1986), we discussed how the felony murder statute protects the public by deterring felonious conduct:

The purpose of the felony murder statute is to protect the public from inherently dangerous situations:
The test we suggest is predicated upon the obvious ultimate purpose of the felony-murder statute itself which is, we think, to prevent the death of innocent persons likely to occur during the commission of certain inherently dangerous and particularly grievous felonies. The method employed by the statute to accomplish this purpose is, of course, to create a deterrent to the commission of such felonies by substituting the mere intent to commit those felonies for the premeditated design to effect death which would otherwise be required in first degree murder if someone were killed in the commission thereof.
State v. Williams, 254 So 2d 548, 550-51 (Fla. 2d DCA 1971) (footnote omitted).