NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

THE L.E. MYERS COMPANY, a foreign )
profit corporation, )
          )
         Appellant, )
          )
v. )      Case No. 2D13-6203
          )
TIMOTHY YOUNG, as Personal )
Representative of the Estate of Allen )
Young, Deceased, )
          )
         Appellee. )
          )

Opinion filed February 27, 2015.

Appeal from the Circuit Court for Manatee
County; Peter Dubensky, Judge.

Shelley H. Leinicke of Wicker, Smith,
O'Hara, McCoy & Ford, P.A., Fort
Lauderdale, for Appellant.

Lisha Bowen and Marc Matthews of
Matthews │ Bowen, Tampa, for Appellee.


VILLANTI, Judge.

        The L.E. Myers Company (Myers) appeals the final judgment entered

against it in this personal injury case arising out of an auto accident. Because the trial

court improperly granted a partial summary judgment in favor of Timothy Young, as

Personal Representative of the Estate of Allen Young, Deceased (the Estate), and also improperly permitted the jury to consider the issue of punitive damages, we reverse and remand for a new trial.

**Facts**

Myers contracted with Florida Power & Light (FPL) on a project that involved replacing a number of power poles in Manatee County. The contract between Myers and FPL required Myers to install four concrete poles, each approximately eighty-five feet long and each weighing approximately 21,000 pounds, along the shoulder of 15th Street East in Bradenton. The contract specified that Myers was an independent contractor responsible for ensuring that the work was completed to FPL's specifications, including providing the necessary traffic control while the work was in progress.

The scope of the contract between Myers and FPL required Myers to dig a hole for each new pole in a location specifically identified by FPL; transport the pole to the work site on a flatbed trailer; provide a crane at the work site to lift the pole from the flatbed trailer, raise it over the existing transmission and distribution wires, and lower it into the newly dug hole; finalize the setting of the pole; and then, in coordination with FPL, move the transmission and distribution wires from the old pole to the new pole. Myers subcontracted the transportation of the pole to Rountree Transport & Rigging (Rountree), and it subcontracted the crane work to Palm Beach Trucking, LLC, d/b/a Merchant Transport, Inc. (Merchant).

On the day of the accident, while Myers' personnel were digging the hole for the new pole, Merchant's crane operator set up his rig based on his assessment of the site characteristics. Soon thereafter, Ronald Baker, the tractor-trailer driver for

- 2 -

Rountree, arrived with the new pole strapped onto the flatbed trailer. The length of the pole was such that it extended off the back of the flatbed trailer by several feet. Myers' personnel directed Baker to park a short distance away from the site while they finished digging the hole.

Once the hole was completed, Myers' personnel directed Baker to bring the pole to the site. To offload the pole, Baker had to park the tractor-trailer in a location dictated strictly by the location of the hole and the location of the crane relative to that hole. Baker backed the tractor-trailer onto the shoulder of 15th Street East and parked where he was directed by Myers' personnel. Baker was able to maneuver the cab of the tractor and the majority of the flatbed trailer fully onto the shoulder of the road, but the outermost left rear tire of the flatbed trailer rested on and slightly over the white line painted on the edge of the road. The concrete pole itself was fully on the shoulder of the road and did not impinge on the roadway in any manner. Baker parked the tractor-trailer, got out, and began helping Myers' personnel unstrap the concrete pole from the flatbed trailer. The crane operator also began to adjust the boom in anticipation of lifting the pole into place.

Myers' safety supervisor, Tommy Byrd, testified that he had placed traffic cones and warning signs on the side of the road on the approach to the work site and that his intent was to stop traffic in both directions on 15th Street East while the crane actually lifted the pole from the flatbed trailer and lowered it into the hole. However, he testified that he did not believe that he needed to divert or stop traffic before that time because although the outermost left rear trailer tire was slightly on the roadway, neither the trailer nor its tires were impeding the flow of traffic.

While the tractor-trailer was parked on the side of the road, Allen Young was driving his Buick southbound on 15th Street East. He stopped approximately seventy-five feet before the Myers' work site, waiting for traffic to clear so that he could turn left into a pawn shop parking lot. Behind him, Roger Nyberg was driving in the same direction, traveling at 91 miles per hour in a 40-mile-per-hour zone and weaving in and out of oncoming traffic. Without braking, Mr. Nyberg slammed into the back of Mr. Young's stopped car. This horrific impact propelled Mr. Young's car forward and spun it around, slamming it by unfortunate happenstance into the end of the concrete pole, which was still atop the flatbed trailer on the shoulder of the road. Mr. Young's car came to rest under the pole with Mr. Young trapped inside. Mr. Young was severely injured, dying from his injuries two years later.

The Estate sued Mr. Nyberg, FPL, Myers, Rountree, Baker, Merchant, and others[1] for their alleged negligence in causing the accident. In its answer to the Estate's second amended complaint, Myers raised a number of affirmative defenses, including its alleged entitlement to set-offs for comparative fault, set-offs for the contributory negligence of third parties not under the control or supervision of Myers, and set-offs for the contributory negligence of the codefendants to the action. The Estate subsequently filed a motion for partial summary judgment as to these three affirmative defenses, arguing that because Myers was engaged in an inherently dangerous activity it was legally responsible for any negligence of its subcontractors and therefore was not entitled to any set-offs for their negligence. Despite finding that there were disputed

---

[1]By the time of trial, all of the defendants other than Myers had either settled with the Estate or been dismissed from the case.

- 4 -

issues of fact, the trial court granted this partial summary judgment, finding as a matter of law that Myers was engaged in an inherently dangerous activity and so was fully liable for any negligence of its subcontractors.

In addition to this partial summary judgment motion, the Estate also filed a motion seeking leave to assert a claim for punitive damages against Myers. In support of this motion, the Estate argued that Myers' negligence was of a gross and flagrant nature as evidenced by its alleged failure to have a traffic plan in place at the time of the accident, its alleged willful blindness to the allegedly binding Department of Transportation rules concerning traffic regulation at roadside construction sites, and its alleged attempts to cover up its negligence after the accident. The trial court granted the motion and permitted the Estate to file an amended complaint seeking punitive damages.

At trial, the Estate presented one witness who testified that Myers did not have traffic cones or warning signs in place before the accident. The Estate also presented expert testimony that Myers should have implemented a traffic plan that complied with Florida Department of Transportation Index 603, which dictated the placement of warning signs and traffic cones in specific locations, as well as the complete closure of the southbound lane of 15th Street East for approximately 300 feet before the start of the work site, because Myers was working within two feet of the edge of the road. The Estate also introduced a diagram of the accident scene prepared by Myers' safety supervisor Mr. Byrd which depicted warning signs and traffic cones in locations allegedly different from those shown in photographs taken of the accident scene itself.

- 5 -

In contradiction to the Estate's evidence, Mr. Byrd testified that Myers did in fact have both traffic cones and warning signs in place before the accident. He also testified that he had intended to stop traffic in both directions on 15th Street East while the pole was being lifted from the flatbed and lowered into the hole. Myers introduced photographs of the accident scene that clearly showed a traffic cone wedged under Mr. Young's car, which tended to support Mr. Byrd's testimony that traffic cones were in place before the accident. And while Mr. Byrd admitted that the traffic plan he implemented would not have satisfied the requirements of Index 603 if it applied, he specifically testified that the field conditions were such that they did not require the use of an Index 603 plan. Thus, he testified that based on his experience and the field conditions present at the scene, his traffic plan was adequate. Myers also presented testimony from an expert traffic engineer that a traffic plan in compliance with Index 603 was not required under the circumstances present at the actual job site. Further, Myers presented evidence that the diagram prepared by Mr. Byrd was generally accurate.

At the close of evidence, Myers moved for a directed verdict on the Estate's punitive damages claim, arguing that the Estate failed to offer evidence sufficient to meet the high legal standard required for an award of punitive damages. The trial court denied this motion. Ultimately, the jury returned a verdict of $1.2 million in compensatory damages and $9.8 million in punitive damages. The trial court subsequently reduced the compensatory damages award to account for the fault the jury attributed to Mr. Nyberg,[2] and it reduced the punitive damages award to $3.6 million

---

[2]Because of the partial summary judgment in favor of the Estate on Myers' contributory negligence defenses, the jury was not asked to determine the fault, if any, of Myers' subcontractors.

pursuant to section 768.73(1)(a), Florida Statutes (2009).[3]  Myers now appeals the final

judgment, raising four issues for review.  We find merit in two of these issues, and, as

explained below, this determination requires us to reverse the final judgment and

remand for a new trial.  Based on this disposition, we do not reach the other two issues

raised by Myers.[4]

## Inherently Dangerous Activity

Myers first argues that the trial court erred by granting the Estate's motion

for partial summary judgment on the threshold issue of whether Myers was engaged in

an inherently dangerous activity.  Under the facts of this case, we hold that the question

of whether the work Myers was performing at the time of the accident constituted an

inherently dangerous activity was a question for the jury rather than the court.

Therefore, we must reverse this ruling.

The inherently dangerous activities doctrine provides that

> a party who "employs an independent contractor <u>to do work involving a special danger to others which the employer knows . . . to be inherent in or normal to the work</u> . . . is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."  Restatement (Second) of Torts § 427

---

[3]Section 768.73(1)(a) limits an award of punitive damages to the greater of three times the amount of compensatory damages awarded to each claimant or $500,000.  While Myers argued in this appeal that the trial court erred by applying this statutory limit to the total amount of compensatory damages awarded rather than to Myers' proportionate share of those damages, we need not reach that argument in light of our disposition of the punitive damages award.

[4]In addition to the punitive damages issue discussed in footnote 3 above, Myers also argued that the trial court erred by denying its motion seeking a set-off against its damages award for the amounts paid to the Estate by Myers' subcontractors.  Because we are remanding for a new trial at which the jury will be tasked with determining whether Myers' activities were inherently dangerous, this issue may be rendered moot by the new verdict.  Hence, we do not address this issue in this appeal.

(1965).  An <u>activity is inherently dangerous if the "danger inheres in the performance of the work,"</u> such that "in the ordinary course of events <u>its performance would probably, and not merely possibly, cause injury if proper precautions were not taken.</u>"

<u>Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp.</u>, 908 So. 2d 459, 468 (Fla. 2005) (quoting <u>Fla. Power & Light Co. v. Price</u>, 170 So. 2d 293, 295 (Fla. 1964)) (emphasis added).  Evidence is sufficient to support a finding of an inherently dangerous activity "if there is a recognizable and substantial danger <u>inherent in the work</u>."  <u>Price</u>, 170 So. 2d at 295 (emphasis added).  As explained in section 416 of the Restatement (Second) of Torts:

> One who employs an independent contractor to do work which the employer should recognize as <u>likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken,</u> is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

(Emphasis added.)  And the focus of the inquiry is on the work to be performed by the particular independent contractor for whose activities the plaintiff seeks to hold the defendant liable.  <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.</u>, 286 F.3d 1233, 1248 (11th Cir. 2002).

This court has noted that the question of whether a particular activity is inherently dangerous may, in some circumstances, be treated as an issue of duty and thus decided by the court as a matter of law.  <u>See</u> <u>Smyth ex rel. Estate of Smyth v. Infrastructure Corp. of Am.</u>, 113 So. 3d 904, 911 (Fla. 2d DCA 2013).  However, more commonly the question of whether a particular activity is inherently dangerous is one for the jury, to be determined based on all of the circumstances surrounding the activity in

question.  See id.; see also Doak v. Green, 677 So. 2d 301, 302 (Fla. 1st DCA 1996); Nat'l R.R. Passenger Corp., 286 F.3d at 1249; cf. Fla. Std. Jury Instr. (Civ.) 401.14(c) (providing the jury with instructions on how to determine whether an activity constitutes an inherently dangerous activity).

Here, looking, as we are required to do, strictly at the work to be performed by Myers' subcontractors, the undisputed evidence showed that at the time of the accident Rountree's tractor-trailer was parked on the side of the road.  The concrete pole was still on the trailer, and the pole itself did not extend into the roadway.  In our view, there is no peculiar risk inherent in a tractor-trailer parked on the shoulder of the road with its load intact.  Cf. Am. Auto. Ass'n v. Tehrani, 508 So. 2d 365, 371 (Fla. 1st DCA 1987) (holding that the normal operation of a vehicle—even an unusually large vehicle—is not an inherently dangerous activity in and of itself).  Hence, this undisputed evidence cannot support the trial court's conclusion that the work in progress at the time of the accident was inherently dangerous as a matter of law.

However, the Estate presented evidence of other circumstances surrounding the work occurring at the site when the accident occurred, including that the outermost left rear trailer tire was partially within the southbound travel lane, that the left rear corner of the trailer may have been interfering with traffic flow around the work site, and that Merchant's crane may have been in operation and lifting the pole at the time of the accident.  In light of these additional facts, we hold that the question of whether Myers was engaged in an inherently dangerous activity at the time of the accident could not be determined as a matter of law but instead should have been resolved by the jury. Accordingly, we must reverse the partial summary judgment entered in favor of the

Estate and the judgment that resulted after that ruling.  And because the effect of this ruling by the trial court was to take from the jury an issue that it should properly have decided, Myers is entitled to a new trial on remand.

**Punitive Damages**

Myers also contends that the trial court erred in denying its motion for directed verdict on the issue of punitive damages made at the close of evidence.  We agree with this contention as well.

In <u>American Cyanamid Co. v. Roy</u>, 498 So. 2d 859, 861-62 (Fla. 1986), the supreme court explained the role and proper application of a punitive damages award in a tort action:

> This Court has repeatedly emphasized that the twin purposes of punitive damages—punishment of the offender and deterrence of others who might otherwise act similarly, <u>Mercury Motors Express, Inc. v. Smith</u>, 393 So. 2d 545 (Fla. 1981); <u>Lassitter v. International Union of Operating Engineers</u>, 349 So. 2d 622 (Fla. 1976), are <u>only served when the defendant's behavior transcends the level of simple negligence, and even gross negligence</u>, <u>U.S. Concrete Pipe Co. v. Bould</u>, 437 So. 2d 1061 (Fla. 1983), <u>and enters the realm of wanton intentionality, exaggerated recklessness, or such an extreme degree of negligence as to parallel an intentional and reprehensible act.</u>  This Court has repeatedly striven to mark the line at which point behavior becomes sufficiently culpable to merit societal sanction through the punishing imposition of such damages.  We once again point to the line drawn in our opinion of <u>White Construction</u>, in which we noted that "<u>the character of negligence necessary to sustain a conviction for manslaughter is the same as that required to sustain a recovery for punitive damages.</u>"  455 So. 2d at 1028, quoting <u>Carraway v. Revell</u>, 116 So. 2d 16, 20 (Fla. 1959).
>
> . . . .
>
> We therefore reiterate our observations in <u>White</u> urging restraint upon the courts in <u>ensuring that the</u>

> defendant's behavior represents more than even gross negligence prior to allowing the imposition of punitive damages, in order to ensure that the damages serve their proper function. While we remain hesitant to have trial courts routinely remove the question from the jury's consideration, we note that a directed verdict may properly be granted unless the evidence establishes that the behavior in question involves the following type of misconduct:
>
> > The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
>
> 455 So. 2d at 1029, quoting Carraway, 116 So. 2d at 20 n.12.

(Emphasis added.)

Here, we recognize that the trial court was required to view the evidence in the light most favorable to the Estate when considering Myers' motion for directed verdict. See, e.g., Fell v. Carlin, 6 So. 3d 119, 120 (Fla. 2d DCA 2009) (setting forth the legal standard the trial court must apply when reviewing a motion for directed verdict and quoting Sims v. Cristinzio, 898 So. 2d 1004, 1005 (Fla. 2d DCA 2005)). However, there is simply no view of the evidence presented by the Estate that would support a conclusion that Myers' conduct was of a gross or flagrant character that evinced a reckless disregard for human life. Arguably, there was some evidence from which a jury could have found that Myers was negligent in how it handled the traffic flow around the

- 11 -

work site at the time leading up to the accident. However, the evidence as a whole showed that the danger from the parked flatbed trailer was open and obvious and the collision itself was a freak accident unexpectedly set in motion by an excessively speeding driver who was apparently completely oblivious to the road construction ahead of him. If anything, the evidence would have supported a claim for punitive damages against Nyberg. But there was no evidentiary basis for an award of punitive damages against Myers.

In an attempt to support the award of punitive damages against Myers, the Estate misstates the evidence presented at trial concerning whether Myers had traffic cones and warning signs in place before the accident. The Estate argued in its brief that "multiple witnesses" testified that Myers did not have traffic cones or warning signs in place at the time of the accident. In actuality, only one witness testified to this—and her testimony was that she <u>did not see</u> any traffic cones or warning signs from her vantage point inside her pawn shop. Contrary to the Estate's assertions, this testimony cannot conclusively establish that no traffic cones or warning signs were in place at the time of the accident. Indeed, other witnesses, including a responding police officer and a local shop owner, testified that traffic cones and warning signs were in place. Moreover, several photos taken while Mr. Young was being removed from his car clearly show a traffic cone wedged under the rear tires of his car. This photographic evidence supports Myers' position that traffic cones were in place before the accident, and the testimonial evidence corroborates its position that both traffic cones and warning signs were in place. Thus, contrary to the Estate's argument here, its evidence

did not so conclusively establish a complete absence of traffic cones and warning signs at the scene of the accident as to warrant an award of punitive damages.

The Estate also argues that it was entitled to punitive damages because Myers had no traffic plan in place at the time of the accident. This argument is also belied by the evidence. Witnesses called by the Estate testified that Myers had both warning signs and traffic cones up and that a flagger was in place ready to stop traffic when the pole was attached to the crane and ready to be lifted from the trailer. If nothing else, this testimony constituted evidence that some traffic plan was in place. And while this traffic plan admittedly did not comply with Index 603, there was conflicting evidence presented concerning whether compliance with Index 603 was required given the field conditions. In fact, the Estate's first witness, who was the Manatee County right-of-way manager in charge of approving permits for work in roadway right-of-ways, testified that field conditions would dictate what traffic plan was required, and "as long as they are adhering to one of the Florida Department of Transportation Index 600 series, it would be adequate." Moreover, even if compliance with Index 603 had been required by the field conditions, Myers' failure to satisfy the requirements of that index, standing alone, would not support a claim for punitive damages because Myers did have **a** traffic plan in place—just perhaps not the most ideal traffic plan.

The Estate further argues that the punitive damages award was proper because there was evidence that Myers tried to "cover up" its lack of a traffic control plan after the accident and that this constituted fraud. The basis for this "cover up" claim is the diagram drawn by Myers' safety supervisor that allegedly does not reflect the same placement of warning signs and traffic cones as is reflected in photos taken

after the accident. The Estate contends that this diagram constituted an effort by Myers to hide its errors, for which it should be punished. However, the cases cited by the Estate in support of its position are ones in which the defendant was aware of a harmful defect in a product and took affirmative steps to hide that defect from consumers before the injuries at issue occurred. See, e.g., Gen. Motors Corp. v. McGee, 837 So. 2d 1010 (Fla. 4th DCA 2002) (dealing with GM's efforts to cover up its knowledge that the gas tanks in certain of its vehicles were susceptible to rupture and ensuing fires by hiding documents and witnesses); Johns-Manville Sales Corp. v. Janssens, 463 So. 2d 242 (Fla. 1st DCA 1984) (dealing with Johns-Manville's efforts to cover up information it had about the health hazards of asbestos). It is the coverup of the hazard to which innocent parties are exposed that created the reprehensibility addressed by punitive damages awards in those cases—not a post-accident attempt to diminish liability for ensuing injuries. Here, there is simply no evidence that Myers attempted to cover up or hide any hazard posed by its work on the side of the road. It hid neither witnesses nor photographs nor the disputed diagram. This factual distinction renders the holdings of the Estate's cases inapplicable to support the punitive damages award here.

In short, the Estate presented no evidence that any negligence on the part of Myers was of such a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects" as to warrant an award of punitive damages. Hence, the Estate failed to carry its evidentiary burden on the issue of punitive damages, and the trial court should have directed a verdict in favor of Myers on that claim. We must therefore reverse the punitive damages award in toto.

- 14 -

## Conclusion

In sum, we reverse the final judgment in all respects, and we reverse the order granting summary judgment on Myers' set-off and contributory negligence defenses. On remand, Myers is entitled to a new trial at which the jury must determine the merits of Myers' affirmative defenses, including determining whether Myers' activities on the day in question were inherently dangerous. However, because the trial court should have granted a directed verdict in favor of Myers on the issue of punitive damages at the first trial, punitive damages will not be at issue in any trial held on remand.

Reversed and remanded for further proceedings.

DAVIS, C.J., and BLACK, J., Concur.